UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

ANTHONY TREGILLUS

CASE NO. 8:24cr311-KKM-NHA
18 U.S.C. § 1349

JUL 3 2024 AM 11:09
FILED - USDC - FLMD - TPA

## INFORMATION

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud)**

### A. Introduction

At all times material to this Information:

<u>The Conspirators and Their Enterprises</u>

1. Anthony Tregillus was a resident of the Middle District of Florida and an owner and the registered agent of 1st Choice Medical Supply, LLC ("1st Choice").

2. 1st Choice was a durable medical equipment ("DME") company located in Pinellas County in the Middle District of Florida.

3. Individual A was a resident of the Middle District of Florida and an owner of 1st Choice.

<u>The Medicare Program</u>

4. The Medicare Program ("Medicare") was a federal health insurance program that provided medical benefits, items, and services to individuals:

1

a. aged 65 and older;

   b. under 65 with certain disabilities, and

   c. of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

5. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

6. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

7. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."

8. Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered, among other things, items and services supplied and provided by physicians, medical clinics, laboratories, DMEsuppliers, and other qualified health care providers, including office visits, minor surgical procedures, DME, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. Medicare Part C, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive

2

their Medicare benefits through private managed health care plans ("Medicare Advantage Plans"), including health maintenance organizations and preferred provider organizations. Medicare Part D covered prescription drugs.

Medicare Advantage Plans

9. Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same items and services offered under Medicare Part A and Part B. To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

10. To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare. Those companies were often referred to as Medicare Advantage plan "sponsors." A beneficiary's enrollment in a Medicare Advantage plan was voluntary.

11. Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in original fee-for-service Medicare, CMS made fixed, monthly payments to a plan sponsor for each Medicare beneficiary enrolled in one of the sponsor's plans, regardless of the services rendered to the beneficiary that month or the cost of covering the beneficiary's health benefits that month. The private health insurance companies then reimbursed the provider based on the services that were purportedly provided.

12. Medicare beneficiaries chose to enroll in a managed care plan administered by private health insurance companies, health maintenance organizations, or preferred provider organizations. A number of entities were contracted by CMS to provide managed care to Medicare beneficiaries through various approved plans. Such plans covered DME and related health care benefits, items, and services. Among its responsibilities, these Medicare Advantage plans received, adjudicated, and paid the claims of authorized providers seeking reimbursements for the cost of DME and related health care benefits, items, or services supplied to Medicare beneficiaries.

DME Claims Submitted under Medicare and Medicare Advantage Plans

13. DME were reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

14. DME companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare providers. To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws, rules, and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were

4

given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

15. Medicare and Medicare Advantage plans reimbursed DME providers and other health care providers for medically necessary items and services rendered to beneficiaries. To receive payment from Medicare and Medicare Advantage plans, providers submitted or caused the submission of claims to Medicare or Medicare Advantage plans, either directly or through a billing company.

16. A claim for DME reimbursement was required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

17. Medicare and Medicare Advantage plans would pay a claim for the provision of DME only if the equipment was medically necessary, ordered by a licensed provider, and actually provided to the beneficiary. Medicare and Medicare Advantage plans claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare and Medicare Advantage plans would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### The TRICARE Program

18. TRICARE was a health care program of the United States Department of Defense, Military Health System that covered, among other individuals, active-duty service members, retired services members, and their families. Individuals who received health care benefits through TRICARE were generally referred to as "beneficiaries."

19. The Defense Health Agency ("DHA"), an agency of the Department of Defense, was the military entity that oversaw and administered the TRICARE program.

20. TRICARE paid for certain medical services, including DME, on behalf of beneficiaries.

21. TRICARE reimbursed providers for items provided to TRICARE beneficiaries that were deemed to be medically necessary.

### B. **The Conspiracy**

22. From in or around September 2015 through in or around May 2022, in the Middle District of Florida, and elsewhere, the defendant,

**ANTHONY TREGILLUS,**

did knowingly and willfully combine, conspire, confederate, and agree with others, including Individual A, to commit health care fraud, in violation of 18 U.S.C. § 1347.

### C. Purpose of the Conspiracy

23. It was a purpose of the conspiracy for Anthony Tregillus, Individual A, and others to unlawfully enrich themselves by, among other things: (a) offering and paying illegal kickbacks and bribes in exchange for signed doctors' orders for braces; (b) submitting and causing the submission of false and fraudulent claims to Medicare for braces that were ineligible for Medicare reimbursement and medically unnecessary; (c) concealing and causing the concealment of kickbacks and bribes and false and fraudulent claims; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### D. Manner and Means of the Conspiracy

24. The manner and means by which the defendant and his conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

    a. It was a part of the conspiracy that Anthony Tregillus and Individual A would and did establish 1st Choice in or around September 2015.

    b. It was further a part of the conspiracy that Anthony Tregillus and Individual A would and did own and control 1st Choice.

    c. It was further a part of the conspiracy that Anthony Tregillus certified to Medicare that he and 1st Choice would comply with all Medicare rules and regulations, including that they would not knowingly present or cause to be

presented a false and fraudulent claim for payment by Medicare and that they would comply with the federal Anti-Kickback Statute.

d. It was further a part of the conspiracy that Anthony Tregillus and Individual A agreed to establish 1st Choice solely in Anthony Tregillus's name, concealing Individual A's ownership in the company.

e. It was further a part of the conspiracy that Anthony Tregillus caused CMS 885S Forms to be submitted to Medicare on behalf of 1st Choice falsely representing to Medicare that Anthony Tregillus was the sole owner and managing employee of 1st Choice, and concealing and disguising the ownership and managing control of Individual A. In reality, Individual A maintained an ownership and management interest in 1st Choice.

f. It was further a part of the conspiracy that Anthony Tregillus, Individual A, and others would and did cause, directly and indirectly, the offering and payment of illegal kickbacks and bribes to telemedicine companies in exchange for arranging for medical providers to sign doctors' orders for DME regardless of medical necessity.

g. It was further a part of the conspiracy that Anthony Tregillus, Individual A, and others would and did disguise and conceal the nature and source of these kickbacks and bribes by entering into sham contracts and by using fraudulent invoices that falsely identified the payments as for a flat or hourly rate for marketing

and other services, when in reality the conspirators paid a set amount per doctors' order per brace.

        h.     It was further a part of the conspiracy that Anthony Tregillus, Individual A, and others would and did cause the submission of false and fraudulent claims to Medicare, Medicare Advantage plans, and TRICARE for DME that was medically unnecessary, ineligible for reimbursement, not provided as represented, and for which doctors' orders were procured through the payment of kickbacks and bribes.

        i.     It was further a part of the conspiracy that, from in or around September 2015, and continuing through in or around September 2019, Anthony Tregillus, Individual A, and others submitted, and caused the submission of, approximately $5,672,558 in false and fraudulent claims for braces to Medicare, $1,823,721 in false and fraudulent claims for braces to Medicare Advantage plans, and $211,486.46 in false and fraudulent claims for braces to TRICARE, on behalf of 1st Choice. The doctors' orders for the braces were procured through the payment of kickbacks and bribes, and the braces were medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid approximately $3,095,501 on those false and fraudulent claims. Medicare Advantage plans paid approximately $1,554,115 on those false and fraudulent claims. TRICARE paid approximately $39,442.69 on those false and fraudulent claims.

j. It was further a part of the conspiracy that Anthony Tregillus continued to receive proceeds from the conspiracy through in or around June 2022.

All in violation of 18 U.S.C. § 1349.

## **FORFEITURE**

1. The allegations contained in Count One are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction for the violations alleged in Count One, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of $381,348.00, which is the amount the defendant obtained as a result of the commission of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

*/s/ Glenn S. Leon /cw*
GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

*/s/ Catherine Wagner*
CATHERINE WAGNER
D. KEITH CLOUSER
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice